United States District Court
Southern District of Texas
**ENTERED**
August 07, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ANNETTE RODRIGUEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:21-CV-00297 |
| | § | |
| CITY OF CORPUS CHRISTI, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

Plaintiff Annette Rodriguez filed suit in December 2021 against the Defendant City of Corpus Christi ("the City"). (D.E. 1). The operative complaint is Rodriguez's April 2022 corrected fourth amended complaint. (D.E. 47). In her complaint, Rodriguez raises eight separate claims under the Fair Labor Standards Act ("FLSA"), Equal Pay Act ("EPA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), and the Age Discrimination in Employment Act ("ADEA").[1] These claims arise from Rodriguez's time as the Director of Public Health at the Corpus Christi-Nueces County Public Health District ("the District"), a position she was ultimately terminated from following organizational changes. Now pending are: (1) the parties' cross-motions for summary judgment on all of Rodriguez's claims, along with the responses and replies. (D.E. 81, 82, 85, 89, 92, 93, 95, 99); (2) Rodriguez's motions to

---

[1] Rodriguez also raised a claim under 42 U.S.C. § 1983, but that claim was dismissed. (D.E. 94).

strike declarations submitted by the City, along with the responses and replies (D.E. 88, 98, 101, 102, 103, 108, 109, 111, 112); and (3) the City's motions to exclude two of Rodriguez's expert witnesses, along with the responses and replies (D.E. 83, 84, 90, 91, 96, 97).

For the reasons discussed further below, it is recommended that: (1) Rodriguez's motion for summary judgment (D.E. 81) be **DENIED**; (2) the City's motion for summary judgment (D.E. 82) be **GRANTED**; (3) Rodriguez's motion to strike the declaration of Steven Viera (D.E. 88) be **DENIED**; (4) Rodriguez's motions to strike the declarations of Peter Zanoni and Marie Odette Cruz (D.E. 101, 102) be **DENIED AS MOOT**; and (5) the City's motions to exclude the expert testimony of Luis Wilmot and Patty Jahn (D.E. 83, 84) be **DENIED AS MOOT**.

## I.    *COMPLAINT*

Rodriguez alleges the following in her Fourth Amended Complaint.  (D.E. 47).  She was a 57-year-old woman with hearing loss.  (*Id.* at 3).  She began working for the District in 2002, and was named Interim Director of Public Health the next year.  She remained Interim Director until 2010, when she was officially promoted to Director of Public Health.  (*Id.*).  Pursuant to the employment agreement she signed when promoted, she was employed at the pleasure of both the City Manager and the Nueces County Judge.  (*Id.* at 3-4).  Although she was officially a City employee, actions regarding her employment had to be agreed on by both the City Manager and County Judge.  (*Id.* at 4).  Sometime after Peter Zanoni became City Manager in May 2019, Rodriguez complained about her pay.

However, the City refused to pay her the wages she was entitled to and retaliated against her.  (*Id.*).

Rodriguez suffers from hearing loss, which both the City's Human Resources department and Zanoni were aware of.  (*Id.*).  In a July 2019 budget meeting, Rodriguez could not hear a question Zanoni asked and requested that he speak up.  However, Zanoni refused to speak louder, and subsequently excluded her from critical meetings due to her disability.  In October 2019, Steven Viera, the Assistant City Manager, called Dante Gonzalez, the Assistant Director of Public Health, and told him that Dr. William Burgin, the Public Health Authority, needed to be fired because he was too old.  Gonzalez informed Rodriguez of this conversation.  (*Id.*).  Rodriguez initially refused to comply, but Zanoni forced her to fire Dr. Burgin and accused her of not doing her job.  (*Id.* at 5).  In several instances, Zanoni also condoned unprofessional or lewd comments toward women, including during a presentation given at an employee retreat in January 2020.  (*Id.*).

In December 2019, after Rodriguez first raised an issue regarding her pay, Zanoni gave her a poor performance evaluation to justify giving her the minimum pay increase. (*Id.*).  Rodriguez reported this to the County Judge, Barbara Canales, who disagreed with Zanoni and awarded Rodriguez a 4 percent salary adjustment.  (*Id.*).  In May 2020, in response to the COVID-19 pandemic and public health emergency, Zanoni reclassified all District employees, including Rodriguez, as non-exempt employees who would be paid on an hourly basis rather than on a salary basis.  (*Id.* at 6).  This policy was never rescinded and remained in place through the date of Rodriguez's termination.  Because of her status

as a non-exempt employee, Rodriguez was entitled to overtime pay for extra hours worked, but the City refused to properly compensate her. (*Id.*). Zanoni also stated that, following a market study, all executive employees would receive raises such that their salaries were 90 to 95 percent of the market average. (*Id.* at 6-7). However, Rodriguez only received a 3% raise to 79% of the market average, while Gonzalez, the male Assistant Director who had little public health experience, received a 13% increase to 90% of the market average. (*Id.* at 7). Across all City departments, four Assistant Directors had higher salaries than Rodriguez, three of whom were men. (*Id.*). When Rodriguez inquired how the specific pay rates were determined, Zanoni yelled at her, but was unable to provide an explanation. (*Id.* at 7-8).

In August 2021, Zanoni and Viera retaliated against Rodriguez by placing a false disciplinary memorandum in her personnel file, falsely alleging that she failed to communicate or coordinate with City leadership regarding a press conference. (*Id.* at 8). Canales responded by correcting the record and stating that Rodriguez did an excellent job of communicating and coordinating with City and County leadership. The City also voted to withdraw from the District and create an independent health department. (*Id.*). However, the City subsequently voted to retain exclusive authority over the District, although Canales opposed this. (*Id.* at 9). As part of the transition to City control, Rodriguez was placed on a team to plan how District facilities and locations would work under the City's management. However, Rodriguez was excluded from meetings, and Zanoni named a male who had recently graduated from high school and had no public

health experience as the team lead.  This was another example of Zanoni's history of promoting young and inexperienced men at the expense of more experienced women.  (*Id.*).

All District employees were required to re-apply for their positions.  (*Id.* at 10).  The City verbally communicated that most employees would keep their jobs without any decrease in pay or seniority, but Rodriguez was not given this assurance.  She submitted an application to remain in her position, which the City refused to consider.  She was unilaterally terminated by the City on March 1, 2022.  (*Id.*).  Canales continued to oppose the City's plan to take sole control of the District, which allowed the City to continue to take adverse actions against Rodriguez including withholding pay, improperly assessing her performance to deny her proper pay, undermining her performance, publicly defaming her to the press, and taking other adverse actions without the concurrence of the County Judge as required by her employment agreement.  (*Id.* at 11).  Rodriguez's employment agreement required the concurrence of the County Judge for any action, but the City nonetheless terminated Rodriguez unilaterally.  (*Id.*).  In his 2021 performance evaluation, Zanoni rated Rodriguez as "needs improvement" in several areas, and also falsely alleged that several employees complained about Rodriguez, despite never informing Rodriguez or Canales of those complaints.  (*Id.* at 11-12).  For the same employment period, Canales evaluated Rodriguez to exceed expectations in all categories.  (*Id.* at 12).

The City and its representatives made defamatory statements about Rodriguez to the press, including falsely stating that she earned over $600,000 and more than Dr. Anthony Fauci, the Chief Medical Advisor to the President and Director of the National Institute of

Allergy and Infectious Diseases. (*Id.*). The City made these untrue statements to create a pretext to withdraw from the District and terminate Rodriguez. (*Id.* at 13). Although the County Judge refused to vote in favor of allowing the City to take over exclusive management of the District, the County voted in favor of amending the Cooperative Agreement to give exclusive management to the City. (*Id.*).

Rodriguez raises eight specific claims against the City. First, Rodriguez alleges that the City violated the FLSA by failing to pay a substantial portion of the overtime she was entitled to after being converted to a non-exempt employee in the May 2020 memorandum. (*Id.* at 14-16). Second, she alleges that the City unlawfully retaliated against her under the FLSA by taking several adverse employment actions against her, culminating in her termination, after she demanded the overtime wages that she was entitled to. (*Id.* at 16). Third, Rodriguez asserts that the City violated the EPA by paying her less, and giving her lower raises, than other Directors and Assistant Directors, some of whom were male and younger with fewer responsibilities and less experience. (*Id.* at 17). Fourth, she alleges that the City unlawfully retaliated against her under the EPA by taking several adverse employment actions against her, culminating in her termination, after she demanded the wages she was entitled to. (*Id.* at 18). Fifth, Rodriguez contends that the City violated Title VII by discriminating against her based on sex by paying her less than men, undermining her authority, giving her negative performance reviews based on falsehoods, creating a hostile work environment by turning her employees against her, and ultimately terminating her. (*Id.* at 21-25). Sixth, Rodriguez alleges that the City unlawfully retaliated

against her under Title VII by taking several adverse employment actions against her, culminating in her termination, after she contested the pay disparity between men and women and filed a complaint with the Equal Employment Opportunity Commission ("EEOC").  (*Id.* at 25-26).  Seventh, she asserts that the City unlawfully retaliated against her under the ADA by refusing to make a reasonable accommodation and excluding her from meetings after she informed Zanoni of her hearing disability and filed an EEOC charge.  (*Id.* at 26-27).  Finally, Rodriguez alleges that the City unlawfully retaliated against her under the ADEA by threatening her job and, ultimately, terminating her after she refused to follow Zanoni's order to fire Dr. Burgin due to his age and subsequently filed an EEOC charge.  (*Id.* at 27-28).

## II.   SUMMARY JUDGMENT EVIDENCE

### a.   Documents

In July 1984, the City and County entered a cooperative agreement to form the District.  (D.E. 81-1 at 3-6).  The agreement provided that the member representatives would be the City Manager and County Judge.  (*Id.* at 3).  The agreement could be modified with the written agreement of each member representative and approval of the governing bodies of each member.  (*Id.* at 4).  A member could withdraw from the District with 90 days' notice, or the District could be dissolved by joint agreement of both members.  (*Id.* at 5).  In July 2012, the agreement was amended to provide that the City and County would share in funding the salaries of the Director and Assistant Director, with the City paying 60% of the salaries and the County paying 40%.  (*Id.* at 10).  The Director would be hired

7

by the City Manager and County Judge, while the Assistant Director would be hired by the Director with the agreement of the City Manager and County Judge.  (*Id.*).

On February 1, 2010, Rodriguez was promoted to the position of Director of Public Health.  (D.E. 81-2 at 3).  Her promotion letter stated that "all employees in the City's Executive Pay Plan serve at the pleasure of the City Manager.  As Director of Public Health, you also serve at the pleasure of the Nueces County Judge."  (*Id.*).  The letter was signed by both the City Manager and County Judge at the time.  (*Id.* at 4).

A January 2015, the City completed an audit of the District after receiving complaints of mismanagement, abuse of power, financial impropriety, retaliation, unprofessionalism, unfair hiring practices, and favoritism at the District.  (D.E. 82-1 at 52, 55).  The Corpus Christi Police Department interviewed staff in June 2014 and reported that the majority of supervisors and managers had negative perceptions of the District's administration, saying the work environment was dysfunctional.  (*Id.* at 55).  The employees believed there would be retaliation for disagreeing with the administration.  The administration blamed long work hours and a large workload assigned by the Assistant City Manager at the time, which the Assistant City Manager denied.  Employee concerns included "basic approaches to employee relations such as treating people with respect, consistent enforcement of policies [between the District, City, and County], and dispute resolution."  (*Id.*).  The action plan included the City Manager and County Judge counseling Rodriguez regarding the need to communicate clearly with staff, but also noted

8

that the City Manager and County Judge supported Rodriguez in her role as Director. (*Id.* at 56).

City records from the first market rate pay adjustment in November 2019 showed that the 54 executive-level City employees received raises of between $0 and $46,000, and that after these raises, their pay ranged from between 68% to 111% of the market rate. (D.E. 82-1 at 15). Rodriguez received a $5,000 raise, taking her to 82% of the market rate with a salary of $137,786.09. Gonzalez received an $18,000 raise, taking him to 90% of the market rate with a salary of $123,231.94. The highest raise went to Laura Garcia, the Director of Libraries, while 17 employees received no raise. Those receiving no raise were primarily already within 85% of the market rate or above, although two were not. The employee with the lowest salary relative to the market rate was Daniel Grimsbo, while the highest salaries relative to the market rate were Michael Dice and Nina Nixon-Mendez. (*Id.*). In a letter sent to Rodriguez informing her of her raise, Zanoni stated that the City had a goal "this fiscal year to bring the executive pay group, as a whole, to an average of 85% of what the market salary rates are. Our long-term goal is to bring salary rates to an average of 90% of market over the next three fiscal years." (*Id.* at 16). Zanoni noted that the market rate was determined by surveying 14 Texas peer cities and matching their job titles and descriptions to those of the City's executives, along with working with Workforce Solutions of the Coastal Bend, who conducted their own survey of five peer cities. (*Id.*).

Rodriguez's pay records beginning in January 2020 and ending in February 2022 indicate that she was paid a set salary amount of at least $5,166 every two weeks, including

paid leave. (D.E. 82-1 at 26-41). Rodriguez received additional overtime pay on her paychecks between July 24, 2020, and June 11, 2021. (*Id.* at 29-35). However, while receiving overtime, Rodriguez continued to receive her full regular pay at her salary rate, including paid leave. (*Id.*).

On January 29, 2020, Viera submitted a memorandum to Zanoni regarding five concerns about Rodriguez's job performance. (D.E. 82-1 at 115-16). Viera stated that Rodriguez's executive management team had "lost confidence in her ability to lead" the District. (*Id.* at 115). First, Viera noted that an open records request regarding the recent pay adjustments used the exact same verbiage as an outgoing draft on her work phone, indicating that she was using City resources and time for personal uses. Rodriguez denied the allegation and stated that someone else must have accessed her email and left the verbiage in her draft folder. Second, computer records showed that Rodriguez was not in the office the week of Christmas 2019, and staff confirmed this, but that she took no leave and was paid for the entire week. Rodriguez claimed that she was supposed to be off, but ended up having to work from home. (*Id.*). Third, District employees complained that Rodriguez was not keeping regular hours of work, including being unavailable by phone. (*Id.* at 116). Fourth, it took two hours for Rodriguez to respond to an emergency situation involving a fire, which ultimately required the Assistant Director to contact Rodriguez's teenage daughter to get in contact with Rodriguez. Finally, Viera noted that Rodriguez had recently met with Zanoni regarding the market pay increases, but was upset and agitated, focusing on other employee pay and comparing salaries. Zanoni explained that the survey

10

was based on position and not tenure, but Rodriguez was adamant that they were dismissing her 20-year tenure with the City.  In a subsequent phone call with Viera, Rodriguez alleged that Gonzalez was favored and often quoted his salary to others.  Viera found Rodriguez's behavior unprofessional for a Director.  Based on these issues, Viera stated that management had lost confidence in Rodriguez's ability to lead and that it was time to move in a different direction.  (*Id.*).

On April 16, 2020, Zanoni approved a memorandum sent to him by Rodriguez, titled "Exempt employees to non-exempt status during Public Health Emergency," that provided that "exempt employees, up to and including the director" be paid overtime. (D.E. 81-7 at 3).  The memorandum noted that Canales had approved overtime for all exempt District employees, including the director, "to be paid as non-exempt employees." (*Id.*).

On April 23, 2020, Zanoni and Canales approved a second $21,895 market pay raise for Rodriguez.  (D.E. 82-1 at 17).  The letter informing Rodriguez of the raise noted that the City had the goal of bringing "the executive pay group, as a whole, to an average of 85% to 90% of what the market salary rates are."  The letter noted that Rodriguez's pay was being increased above the 90% threshold due to her experience and tenure with the City.  Rodriguez's effective salary after this raise was $160,200, or $165,000 including a car allowance.  (*Id.*).

On June 24, 2021, Mayor Paulette Guajardo e-mailed Zanoni regarding the $11,000 in overtime pay that Rodriguez received the previous pay period.  (D.E. 81-16 at 3).

Guajardo stated that it was not in the City's best interests to allow such a large overtime payment and discouraged the approval of future overtime pay.  (*Id.*).

On July 22, 2021, Rodriguez e-mailed Viera regarding Zanoni's decision to stop paying her overtime and because her approved pay increase from January 2020 had not been processed.  (D.E. 81-17 at 3).  She stated that the hours she was working were not normal and noted that Gonzalez's pay increase went through without an issue.  She indicated that she felt she was being treated differently.  Rodriguez also discussed the work she was required to do, which included writing grants, creating budgets, and developing workplans, along with continuing to oversee the day-to-day operations of the District and staff.  (*Id.*).

In July and August 2021, the City's Human Resources Department investigated employee complaints that Rodriguez created a hostile work environment.  (D.E. 81-13 at 3-5).  In interviews with employees, they all agreed that Rodriguez could be unprofessional and intimidating, and the employees felt vulnerable after Gonzalez was transferred to a different department.  (*Id.* at 3).  The employees noted that Rodriguez was rarely in the office over the past year, but that they tried to avoid interactions with her or Dina Chavez, a County employee who was seen as an extension of Rodriguez.  (*Id.* at 3-4).  Most employees interviewed agreed that Rodriguez had a history of retaliatory conduct and threats.  (*Id.* at 4).  Some employees were concerned about fraudulent purchases made with a District card, along with falsification of hours worked.  (*Id.* at 4-5).  In 2005, Rodriguez was counseled for misuse of time and sharing confidential information.  (*Id.* at 5).  In 2014,

four employees filed complaints for similar conduct to what Rodriguez was now being investigated for.   The report concluded that, "[a]lthough there is an appearance of unprofessional conduct and communication in the workplace and suspicious recording of excessive overtime, the allegations could not be confirmed."   However, the investigator noted that, based on her interviews with the employees, she believed that "most of these employees believe they work in a hostile work environment, and they do fear for their jobs which in fact does negatively impact their work environment."   (*Id.*).

On August 16, 2021, Viera issued a memorandum to Rodriguez for her personnel file citing her "Failure to Communicate and Coordinate with City Leadership."   (D.E. 81-10 at 4).   He stated that Rodriguez was present at a meeting with City leadership where it was stated that a mask mandate for Nueces County public schools would not be implemented until the Texas Supreme Court made a final ruling on the issue.   However, Rodriguez was then present at a press conference with the County Judge and Public Health Authority where a health directive was issued requiring face coverings at all schools, contrary to state law.   Viera stated that Rodriguez's failure to communicate and coordinate showed a lack of leadership.   (*Id.*).

On August 18, 2021, Canales issued a memorandum for Rodriguez's personnel file citing her "Excellent Communication and Coordination with City and County Leadership." (*Id.* at 6).   She stated that Rodriguez had communicated the details of the school mask initiative to the City and County.   (*Id.* at 7).   Canales cited text messages and emails between herself, Zanoni, and the City's mayor regarding the lead-up to the school mask

13

mandate.  (*Id.* at 7-10).  Canales stated that the City's disciplinary memorandum was false. (*Id.* at 10).

On August 19, 2021, Rodriguez e-mailed Viera to send in her overtime.  (D.E. 81-6 at 46).  She noted that Canales asked that she continue to receive the 40% of her overtime that the County would be responsible for and that she would continue to send documentation of her overtime hours.  (*Id.*).

On October 7, 2021, Rodriguez's legal counsel sent a letter to Zanoni, informing him that Rodriguez had retained legal counsel regarding her complaints about pay and other issues, including sex discrimination and a hostile work environment.  (D.E. 92-16 at 3-5).

On October 19, 2021, the City Council voted to withdraw from the District, effective 90 days after notice of the withdrawal.  (D.E. 82-1 at 94-96).

On November 1, 2021, Rodriguez filed a Charge of Discrimination with the EEOC, alleging violations of Title VII, the ADA, and the ADEA.  (D.E. 92-16 at 6).  She alleged discrimination based on sex, age, and disability, along with retaliation.  (*Id.*).  On November 8, 2021, she filed a Charge of Discrimination with the Texas Workforce Commission alleging the same, along with a violation of the EPA.  (*Id.* at 8-9).

In the City's 2021 performance review of Rodriguez, leadership indicated that Rodriguez needed improvement in several areas, but assigned "meets expectations" or "exceeds expectations" scores for each overall section.  (D.E. 81-12 at 3-5).[2]  Rodriguez's

---

[2] This document is not signed or dated.  However, it is undisputed that it is the City's 2021 performance evaluation of Rodriguez.

overall rating was "meets expectations." (*Id.* at 4).  The evaluation stated that "[a]ttendance and availability continue to be an issue for Annette.  Numerous employees have complained that Annette does not report to work daily and often works minimal hours when she is there.  We have been able to verify this through various IT processes."  Moreover, the evaluation stated that the District lacked protocols and standard operating procedures, and that Rodriguez failed to communicate with City leadership and did not inform them of events or issues until after the fact.  The evaluation stated that Rodriguez "does not engage staff in a professional manner and often belittles or berates them" and that she had created a hostile work environment for several employees, which the human resources department investigated and found to be true.  (*Id.*).  Viera sent Rodriguez a copy of this evaluation on January 7, 2022.  (D.E. 81-19 at 4).  Rodriguez requested a copy of the human resources investigation and disputed the other negative notes regarding her performance.  (*Id.* at 3).

In the County's 2021 performance review of Rodriguez, Canales gave her "exceeds expectations" ratings in every area.  (D.E. 81-14 at 5-7).

City records from January 2022 showed that, since October 2019, Rodriguez had received two performance pay increases and three additional pay adjustments.  (D.E. 82-1 at 18, 23).  Since Zanoni took over as City Manager, Rodriguez's pay had increased from $126,789 to $170,132.  (*Id.* at 23).  On January 3, 2022, Rodriguez received another performance increase to $170,132.40.  (*Id.* at 24).

In a February 2022 text message to a city council member, Zanoni stated that Gonzalez had been moved out of the District "due to a hostile work environment" and that

the City had "promised him that we would give him options going forward. He's a talented team member." (D.E. 81-15 at 3).

On February 15, 2022, the County Commissioners Court and City officials agreed on an amended cooperative agreement for the District that allowed the City to exercise sole operational control over the District while still providing services to all County residents. (D.E. 82-1 at 97-105). The new agreement gave the City the sole authority to terminate all employees of the District, including the Director. (*Id.* at 98). The County specifically delegated its authority to appoint a Director to the City. (*Id.* at 103). The new agreement would take effect on March 1, 2022. (*Id.* at 104). Four County Commissioners signed the agreement, along with the County Attorney and County Clerk, although Canales did not. (*Id.* at 105).

In a March 1, 2022, text message, Zanoni informed Rodriguez that she was terminated, effective immediately. (D.E. 81-20 at 2). In a subsequent text message, Canales indicated that she did not agree with the decision. (D.E. 81-21 at 2).

In August 2022, the City offered the Director position to Dr. Fauzia Khan. (D.E. 81-24 at 12). Dr. Khan's resume indicated that she had the Pakistani equivalent of an MD degree and a Master of Public Health. (*Id.* at 7). Most recently, she was the Immunization Service Director for the State of Oklahoma, but she had been working in the public health sector since 2006. (*Id.* at 5-7).

On March 20, 2023, Linda Steward, the City's Neighborhood Services Director, submitted a letter of resignation. (D.E. 92-12 at 2). In the letter, Steward alleged that the

City's executive leadership team fostered an environment of sexism, paranoia, gaslighting, and impulsive actions intended to build their own power. She did not believe she could expect to be treated fairly as a woman in the administration. (*Id.*).

    **b.**    **Deposition Testimony**

Rodriguez testified to the following in her deposition. (D.E. 81-3, 82-3). In December 2019, she met with Zanoni, Viera, and Zanoni's Chief of Staff to discuss the market study. (*Id.* at 3). She was concerned because she had been the Director for over 20 years and received only a $5,000 raise, while her Assistant Director received an $18,000 raise. (*Id.* at 4). The process was secretive, and they had not told her how much the Assistant Director's increase was, which was problematic because Rodriguez managed the District's budget, and the County was also responsible for part of the pay. A human resources employee told her there was a mistake in the market study and her pay would be increased by an additional $5,000, but Zanoni said there was no mistake and removed the additional increase. (*Id.*). After the market pay study, Gonzalez's pay was increased to $123,000, and Rodriguez's pay was increased to $132,000. (D.E. 82-3 at 6). The only explanation for the difference between her pay increase and Gonzalez's increase was "[t]hat was what the market shows." (*Id.*). Rodriguez did not disagree with them but was merely trying to figure out if they considered an employee's tenure and experience in making their decision. (*Id.* at 7). She received no explanation for how they decided what raises to give different people, and Zanoni "yelled at [her], told [her she] was very ungrateful." (D.E. 81-3 at 5). Rodriguez also talked to the County Judge, who told her to

talk to Zanoni because maybe the City had not accounted for longevity. (*Id.* at 5-6). The human resources employee stated that they did not consider longevity, but she did not know why. (*Id.* at 6). Rodriguez believed it was because there were many new people, and it was advantageous to them to ignore longevity when determining the raises. (*Id.*).

Rodriguez further testified that, in July 2021, Viera informed her that they were moving Gonzalez, her Assistant Director, to the Parks and Recreation Department, which Rodriguez thought was odd during a pandemic. (*Id.* at 7). She did not ask why he was being moved. (*Id.*). At a January 2020 retreat for the City's executives, a speaker showed a slide of an unclothed woman with a male doctor listening to her heartbeat. (*Id.* at 8-9). The speaker said that this was the way doctors used to listen to a heartbeat. (*Id.* at 9). The next slide had a picture of a stethoscope, and the speaker commented that the doctors preferred to do it the old way. The men in the room laughed, but the women did not. (*Id.*).

Rodriguez further testified that Zanoni spoke more with Gonzalez when he needed information about the District. (*Id.* at 10). When Rodriguez initially offered Gonzalez the position, she offered a salary of $89,000, but Zanoni immediately raised it to $104,000. Zanoni liked to speak to Assistant Directors, which was not how it worked before Zanoni took over. (*Id.*). In the early summer of 2020, Rodriguez was working 14.5 to 15.5 hours every day. (*Id.* at 13). She was keeping track of her hours worked, although her timesheets may not have been perfectly accurate as to the specific start and end times because it was impossible to do so. (*Id.* at 12-13). During the pandemic, she was "in city command for the whole event," which included interfacing with hospitals to determine how busy they

were.  (*Id.* at 13).  After the City chose to stop paying her overtime, it appeared to her that Canales continued to try to get her overtime pay, but the County never actually paid her any additional overtime either due to the pay structure of the District.  (D.E. 82-3 at 8-10). A 2021 performance evaluation noted that Rodriguez had created a hostile work environment for several employees, but no one had ever told Rodriguez about those reports before she saw the evaluation.  (D.E. 81-3 at 14).

Rodriguez further testified that she had inherent deafness.  (*Id.* at 15).  She told Zanoni about this disability.  Sometimes she could not hear questions at meetings, and she would look at Zanoni for him to tell her what the question was, but he would not say anything.  (*Id.*).  At the time Rodriguez was promoted to Director, she spoke to the City Manager and County Judge, and they told her that, despite the 60/40 salary split, she was equally responsible to both the City Manager and County Judge.  (*Id.* at 16-17).

Viera testified to the following in a deposition as a Rule 30(b)(6) representative of the City.  (D.E. 81-4).  The County Judge was involved in changes to the conditions of employment for the Director and Assistant Director of the District, including salary adjustments and performance evaluations.  (*Id.* at 2-3).  The goal of the market rate study was to bring executive salaries within 90 percent of the market rate.  (*Id.* at 3-4).  During the pandemic, there was a time when certain exempt employees were paid overtime.  (*Id.* at 6).  There was never a memo rescinding this decision, but Viera spoke to both Rodriguez and Gonzalez to inform them that they would no longer be paid overtime.  (*Id.* at 6-7). Viera was not aware of a human resources report regarding the employee complaints about

Rodriguez.  (*Id.* at 9).   In a performance evaluation, Canales gave Rodriguez a 4 rating, indicating that she exceeded expectations, in all areas, while the City gave Rodriguez a 3 rating, indicating that she met expectations, in all areas.  (*Id.* at 11-12).  To resolve this difference, they averaged the ratings, resulting in a 3.5, which was rounded to a 4.  (*Id.*). When the City took over sole control of the District, Rodriguez was able to re-apply for her position, and she was considered.  (*Id.* at 12-13).  The position ultimately went to Dr. Khan, a medical doctor in Pakistan.  (*Id.* at 13).  Her doctorate was recognized in the United States, although not as a medical doctor, and she had a Master of Public Health in the United States.  (*Id.* at 13).  Around four employees from the unified District were not re-hired when the City began sole control.  (*Id.* at 15).  The City continued to pay overtime to other District employees even after ending overtime payments to Rodriguez.  (*Id.* at 16). Viera reiterated that he did not believe a formal investigation was done on the employee complaints regarding Rodriguez.  (*Id.* at 18-19).

Viera further testified that the City initially stopped overtime payments to just Rodriguez and Gonzalez, but he did not remember when they stopped overtime payments for other District employees.  (D.E. 93-5 at 9).  As of January 17, 2023, a few employees were still being paid overtime through a grant.  (*Id.*).

Patty Jahn, a CPA, testified in her deposition that the figures in the market pay survey appeared to be manipulated to achieve particular results, including by using figures from different cities to reach the market rate for different positions.  (D.E. 85-1 at 5-8). The City also misconstrued Rodriguez's pay in the media.  (*Id.* at 15-17).

c.      **Affidavits and Declarations**

Canales, the County Judge from January 1, 2019, to January 1, 2023, stated the following in a January 3, 2023, affidavit. (D.E. 81-6). Although the County Commissioners Court voted to transition the District to the City's sole control, Canales opposed this as contrary to the interests of public health and contrary to state law. (*Id.* at 3). The City's decision to terminate Rodriguez was also contrary to the cooperative agreement and state law. (*Id.* at 3-4). The tone of the City's management of the District changed when Zanoni became City Manager, and his evaluation of Rodriguez's performance was consistently lower than Canales's evaluations. (*Id.* at 4). Zanoni became very good friends with several City employees, primarily males, including Viera and Gonzalez. (*Id.*). Zanoni ignored Rodriguez and engaged only with Gonzalez. (*Id.* at 4-5). Following the market study, the City gave a much larger relative pay increase to Gonzalez, and also failed to formally approve Rodriguez's pay increase. (*Id.* at 5). In March 2020, Canales approved overtime payments to all exempt employees of the District. This memorandum was never rescinded. The City began to refuse overtime payments to Rodriguez in June 2021, but Canales continued to direct that she be paid overtime and did not agree with the City's decision to stop paying her. (*Id.*).

Canales further stated that she believed the City was retaliating against Rodriguez for her criticisms regarding the City's withholding of her market pay increase and overtime. (*Id.* at 5-6). In August 2021, the City threatened District employees with criminal sanctions if they recommended a mask mandate, and after Rodriguez supported a mask mandate, the

City put a falsified disciplinary memorandum in her personnel file. (*Id.* at 6). Canales issued a letter response correcting the memorandum and reminded Zanoni that she had to be involved in any disciplinary action against the Director, but he never responded. Canales disagreed with the City's statements in Rodriguez's performance evaluation that she was unprofessional, noncommunicative, and created a hostile work environment, and the City could not substantiate these claims. (*Id.*). Nonetheless, the City took adverse actions against Rodriguez, including denying her earned pay increases and overtime pay and initiating disciplinary measures. (*Id.* at 6-7). On March 1, 2022, the County Commissioners Court voted to transition the District to the City's sole control, and the City then terminated Rodriguez, which Canales believed violated state law and breached Rodriguez's employment agreement. (*Id.* at 7).

Viera stated the following in a February 24, 2023, declaration. (D.E. 82-1 at 2-11). He had been the Assistant City Manager since 2019. (*Id.* at 2). He was the City's immediate contact with the District before March 1, 2022, and since then he supervised the District. (*Id.*). Zanoni became City Manager in May 2019. (*Id.* at 3). One of his first initiatives was to increase executive staff salaries to be more competitive with the market rate. The City surveyed other municipalities to determine what they were paying comparable executive employees. Rodriguez received two raises during this process. (*Id.*). Responsibility for payroll and benefits for District employees was split between the City and the County prior to March 1, 2022. (*Id.* at 4). The City handled payroll for Rodriguez and Gonzalez, although the County was responsible for paying part of their salary, while

other employees were designated as either City or County employees and paid accordingly. (*Id.*).  At the start of the COVID-19 pandemic, Rodriguez requested overtime pay for exempt employees, including herself, which the City approved.  (*Id.* at 5).  Typically, Rodriguez was an exempt employee who would receive the entirety of her salary for a week regardless of how many hours she worked but was not eligible for overtime.  (*Id.*).

Viera further stated that Rodriguez's primary duty was management of the District, including a staff of over 50 employees and a budget that exceeded $25 million during the pandemic.  (*Id.* at 6).  She represented the District before the public and in meetings with other agencies.  She directed the work of employees and had the authority to hire, fire, and make other employment decisions.  Rodriguez represented the District before the public during the pandemic, but public and governmental opinion eventually split regarding appropriate safety measures, including mask mandates.  The governor issued an executive order prohibiting local governments from issuing mask mandates, but Rodriguez and Canales supported such mandates.  (*Id.*).

Viera further stated that the District was governed by a cooperative agreement between the City and the County, but their dual control of the District had caused problems in the past when their objectives differed or when City and County employees were treated differently.  (*Id.* at 7).  Discussions about restructuring the District began as early as 2015. In 2021, the City ultimately chose to withdraw from the District.  (*Id.*).  Instead of withdrawing, the County agreed to restructure the District to allow the City to exercise sole day-to-day control while continuing to provide services to County residents who lived

outside the City.  (*Id.* at 7-8).  Rodriguez's employment with the District ended on March 1, 2022, when the City's sole control began.  (*Id.* at 8).  All District employees were required to re-apply for their jobs.  (*Id.*).  The City was willing to consider Rodriguez for the position given the possibility that she would be able to perform better without having to balance conflicting interests from the City and County, which she had to do multiple times when they shared operational control.  (*Id.* at 8-9).  However, during the transition process, the City heard employee complaints regarding Rodriguez's managerial style and employee morale.  (*Id.* at 9-10).  Viera and Zanoni had heard of similar issues from Gonzalez, who they reassigned to the Parks and Recreation Department to avoid losing. (*Id.* at 10).  Viera was also aware of similar comments made to the human resources staff, although he was not aware that they had prepared a report regarding them.  (*Id.*).  Based on his own observations of Rodriguez's performance, Viera recommended a change in January 2020, but Canales disagreed with the recommendation.  (*Id.* at 11).

Viera stated the following in a March 23, 2023, declaration.  (D.E. 93-1 at 2-5). Rodriguez's pay was based on an annual salary.  (*Id.* at 3).  When she stopped receiving overtime, Gonzalez also stopped receiving overtime.  (*Id.*).  The City hired Dr. Khan, a female, for the District's Director position.  (*Id.* at 4).  Gonzalez applied for the position and was considered, but was not hired and instead returned as the Assistant Director.  Viera was not aware of any employee complaints regarding Gonzalez's management style or behavior.  (*Id.*).  He attended the same executive retreat as Rodriguez in February 2020, and no slide depicting a naked woman was shown.  (*Id.* at 5).

24

### III.  MOTIONS FOR SUMMARY JUDGMENT (D.E.s 81, 82)

#### a.    Summary Judgment Standard

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence or evaluate the credibility of witnesses. *Id.*  The Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Salazar-Limon v. City of Houston*, 826 F.3d 272, 274-75 (5th Cir. 2016).  In doing so, the Court can credit "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).  Furthermore, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451.

b.   **Discussion**

i.   *FLSA Overtime*

First, Rodriguez asserts that she is entitled to summary judgment on her FLSA overtime claim because it is undisputed that: (1) she was an employee of the District until March 1, 2022; (2) she was entitled to overtime pay pursuant to the overtime memorandum; and (3) the City stopped paying her overtime in June 2021 despite her still being entitled to it. (D.E. 81 at 19-20). Rodriguez argues that the City stopped paying her overtime merely because it believed she was being paid too much, but that her amount of pay alone was insufficient to render her exempt from overtime pay. (*Id.* at 20; D.E. 92 at 8). Rodriguez contends that, after the City adopted the overtime memorandum that rendered all District employees as non-exempt, she was no longer paid on a salary basis, but rather solely on an hourly basis, and that the overtime memorandum was never rescinded and her

pay remained on an hourly basis until she was terminated.  (D.E. 81 at 20; D.E. 92 at 8-10; D.E. 95 at 3-4).

The City contends that it is entitled to summary judgment on Rodriguez's FLSA overtime claim because Rodriguez was an exempt employee who was not entitled to overtime pay.  (D.E. 82 at 9).  The City argues that Rodriguez's annual and weekly salary exceeded the regulatory thresholds for exempt status and her duties matched those expected of an exempt employee, including managing a sizeable staff and budget.  (*Id.* at 9-10).  The City asserts that the overtime memorandum did not convert her into a non-exempt employee because an employer's decision to provide extra compensation does not, in itself, remove exempt status where the employee is still guaranteed the regulatory weekly minimum on a salary basis.  (*Id.* at 11-12; D.E. 93 at 7-8).  The City argues that Rodriguez's compensation was always based on her annual salary and was never purely hourly.  (D.E. 93 at 8; D.E. 99 at 6-8).  The City asserts that the County also stopped paying Rodriguez overtime when the City did.  (D.E. 93 at 8-9).  Finally, the City argues that the relevant time period is after June 11, 2021, when neither the City nor the County was paying Rodriguez overtime and she was paid solely on a salary basis.  (D.E. 99 at 8-9).

The FLSA is construed "liberally in favor of employees, and exemptions are to be narrowly construed against the employers seeking to assert them."  *McGavock v. City of Water Valley, Miss.*, 452 F.3d 423, 424 (5th Cir. 2006) (internal quotation marks and citation omitted).  A plaintiff must prove four elements to make a *prima facie* case of unpaid overtime compensation: "(1) that there existed an employer-employee relationship

during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's overtime wage requirements; and (4) the amount of overtime compensation due". *Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014) (citations omitted). Each element must be proven by a preponderance of the evidence. *Id.*

The FLSA requires overtime compensation for any hours worked above 40 in a workweek. 29 U.S.C. § 207(a)(1). However, certain categories of employees are exempt from overtime requirements. 29 U.S.C. § 213. "An individual employed in a bona fide executive, administrative, or professional capacity is exempt." *Smith v. Ochsner Health Sys.*, 956 F.3d 681, 684 (5th Cir. 2020) (internal quotation marks omitted). This exemption comes in two forms. *Id.* The first is a standalone exemption created by statute and defined in the regulations, while the second is the "highly compensated employee" exemption, which was created by regulation. *Id.*

Under the highly compensated employee exemption, "an employee with total annual compensation of at least $107,432 is deemed exempt … if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601(a)(1). This must include payment of at least $684 per week on a salary or fee basis. *Id.* § 541.601(b)(1). "An employee will be considered to be paid on a 'salary basis' … if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to

28

reduction because of variations in the quality or quantity of the work performed." *Id.* § 541.602(a).

"A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." *Id.* § 541.601(c).  Accordingly, "a highly compensated employee will qualify for exemption if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." *Id.*  In relevant part, these exempt duties include: (1) a primary duty of "manag[ing] the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;" (2) "customarily and regularly direct[ing] the work of two or more other employees;" (3) "the authority to hire or fire other employees" or make suggestions and recommendations regarding "the hiring, firing, advancement, promotion or any other change of status of other employees [that] are given particular weight;" (4) a primary duty of "the performance of office or non-manual work directly related to the management or general business operations of the employer;" and (5) a primary duty "includ[ing] the exercise of discretion and independent judgment with respect to matters of significance." *Id.* §§ 541.100, 541.200.  Additionally, the highly compensated employee exemption "applies only to employees whose primary duty includes performing office or non-manual work." *Id.* § 541.601(d).

A "primary duty" is "the principal, main, major or most important duty that the employee performs," based on all the facts in the case. *Id.* § 541.700(a).  Among others,

relevant factors to consider in determining the primary duty of an employee include the relative importance of exempt duties compared to other duties and the amount of time spent performing exempt work. *Id.* "Customarily and regularly" means "a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." *Id.* § 541.701. "To determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." *Id.* § 541.105.

"In contrast to the [highly compensated employee] exemption, the standalone administrative exemption depends only on the employee's primary duty rather than the employee's customary duties." *Smith v. Ochsner Health Sys.*, 956 F.3d 681, 684 (5th Cir. 2020) (citing 29 C.F.R. § 541.200(a)). This exemption applies when an employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and the "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

"An employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis." 29 C.F.R. § 541.604(a). For example, "the exemption is not lost if an exempt employee who is guaranteed at least $684 each week paid on a salary basis also receives additional compensation based on hours worked for work beyond the normal workweek." *Id.* Such compensation may be paid on any basis. *Id.* Further, an "exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned." *Id.* § 541.604(b).

Here, the summary judgment evidence establishes that Rodriguez was an exempt employee who was not entitled to overtime pay, and Rodriguez has not shown that there is a genuine issue of material fact regarding her employment status. The first two elements of a claim for unpaid overtime compensation are undisputed: Rodriguez was an employee of the City during the claimed time periods, and Rodriguez worked over 40 hours per week during at least some of the claimed period.[3] *See Johnson*, 758 F.3d at 630. However,

---

[3] Throughout the evidence, the City and City officials raise some question regarding whether Rodriguez worked the hours claimed. However, the City does not dispute Rodriguez's hours in its motion for summary judgment. (*See* D.E. 82 at 8-12).

Rodriguez has not established a genuine issue regarding whether she was an exempt employee, and the summary judgment evidence establishes that she met all the necessary criteria to be exempt. Accordingly, she has failed to establish a prime facie case of unpaid overtime compensation because she has not established the third element, that the employer violated the FLSA's overtime wage requirements. *See id.*

The summary judgment evidence shows that Rodriguez was "employed in a bona fide executive … capacity" and was exempt under both the standalone exemption and the highly compensated employee exemption. *Smith*, 956 F.3d at 684. First, under the highly compensated employee exemption, it is undisputed that Rodriguez received pay of over $107,432 per year throughout the claimed time period, including at least $684 per week. (*See, e.g.*, D.E. 82-1 at 15, 17, 18, 23-24 26-41); 29 C.F.R. § 541.601(a)(1), (b)(1). Although Rodriguez claims that this payment was not on a salary basis after the issuance of the April 2020 overtime memorandum, but rather on an hourly basis, her pay records contradict that contention. Her pay records indicate that she was paid a full, predetermined amount on a bi-weekly basis regardless of how many hours she worked, including having paid sick leave, personal leave, and holidays. (D.E. 82-1 at 26-41); 29 C.F.R. § 541.602(a). From July 24, 2020, to June 11, 2021, Rodriguez's pay included additional overtime compensation on top of this predetermined salary. (*Id.* at 29-35).

Because Rodriguez was highly compensated on a salary basis throughout the relevant time period, a detailed analysis of her job duties is unnecessary. 29 C.F.R. § 541.601(c). Under this lessened standard, the undisputed summary judgment evidence

32

shows that Rodriguez customarily and regularly performed responsibilities of an executive, administrative, or professional employee in her role as Director of Public Health, including directing the work of two or more employees, performing office or non-manual work directly related to the management operations of her employer, and exercising discretion and independent judgment with respect to matters of significance, among others.  (D.E. 81-17 at 3; D.E. 82-1 at 6); 29 C.F.R. §§ 541.100, 541.200.  To qualify for the exemption, Rodriguez need only have performed one of these duties, but the undisputed evidence shows that she performed multiple.  As required, the evidence also shows that Rodriguez's primary duty was performing office or non-manual work.  (*See, e.g.*, D.E. 81-17 at 3; D.E. 82-1 at 6); 29 C.F.R. § 541.601(d).  Accordingly, Rodriguez was exempt from the FLSA overtime requirements based on the highly compensated employee exemption.

The undisputed evidence also establishes that Rodriguez was exempt under the statutory standalone exemption.  In her role as Director, Rodriguez's primary duty was "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and also included "the exercise of discretion and independent judgment with respect to matters of significance." (D.E. 81-17 at 3; D.E. 82-1 at 6); 29 C.F.R. § 541.200(a).  For example, in describing her own duties in a July 2021 e-mail, Rodriguez stated that she was applying for millions of dollars in grants, creating budgets, developing workplans, and leading the day-to-day operations of the District and its staff.  (D.E. 81-17 at 3).  In his declaration, Viera described Rodriguez's duties similarly, stating that she managed the District, including its staff of

over 50 people, and represented the District in the public.  (D.E. 81-2 at 6).  Accordingly, Rodriguez was also exempt from the FLSA overtime requirements based on the standalone exemption.

Finally, Rodriguez has not established that the April 2020 overtime memorandum converted her status to a non-exempt employee.  The memorandum approved "overtime compensation for exempt [City] employees, up to and including the director," retroactive to February 10, 2020.  (D.E. 81-7 at 3).  The memorandum noted that Canales had approved "all exempt County employees … to be paid as non-exempt employees."  (*Id.*).  The language of the memorandum does not convert exempt employees to non-exempt status, but rather agrees to pay them their regular salary plus overtime equivalent to what non-exempt employees would receive.  This interpretation is further supported by the regulations, which directly address whether an employer may pay an exempt employee overtime without converting the employee to non-exempt status.  So long as an employer continues to pay an exempt employee the minimum weekly amount on a salary basis, they may also provide additional compensation on any basis without losing the exemption.  29 C.F.R. § 541.604(a).  Further, Rodriguez has not shown that the overtime memorandum needed to be rescinded in writing to end the overtime payments.

In short, the undisputed summary judgment evidence shows that Rodriguez was an exempt employee based on her annual salary, weekly pay, and job duties.  The City, through the overtime memorandum, agreed to pay her additional compensation as an exempt employee, but this did not convert Rodriguez to non-exempt status because she

was still receiving her original pay on a salary basis as well.   Accordingly, it is recommended that the City's motion for summary judgment (D.E. 82) be **GRANTED** on Rodriguez's FLSA claim.   Correspondingly, it is recommended that Rodriguez's motion for summary judgment (D.E. 81) on this claim be **DENIED**.

>    ii.    *FLSA Retaliation*

Rodriguez next asserts that she is entitled to summary judgment on her FLSA retaliation claim because it is undisputed that: (1) she complained to human resources regarding the inequitable results of the market pay study and sought to have a meeting regarding it; (2) the City took multiple adverse actions against her following her complaint, including undervaluing her performance in her annual review, withholding information from an investigation, authoring a false disciplinary memorandum, denying her overtime pay, and terminating her; and (3) the evidence shows a causal connection between her complaint and the adverse actions given Zanoni's and Viera's responses and subsequent actions.   (D.E. 81 at 21-24).   Finally, Rodriguez contends that all of the City's stated reasons for the adverse actions and termination were merely pretext, as shown by the fact that the candidate they ultimately hired to replace her had less experience and fewer qualifications.   (*Id.* at 24-25).

The City contends that it is entitled to summary judgment on Rodriguez's FLSA retaliation claim because she cannot prove any protected activity, nor can she show a causal link between any protected activity and an adverse employment action.   (D.E. 82 at 27). The City argues that there is no evidence that Rodriguez ever complained about a potential

illegality or FLSA violation, but rather only that the salary adjustments did not take longevity into account, which does not establish that she engaged in a protected activity under the FLSA. (D.E. 93 at 24-25). As to causation, the City argues that the time gaps between the alleged complaints and adverse actions were too great to support causation. (*Id.* at 28-31). The City contends that Rodriguez has otherwise not alleged or shown anything that qualifies as an adverse employment action. (*Id.* at 32-33). To the extent Rodriguez's retaliation claim is based on her termination, the City argues that she was not retained as Director due to leadership's doubts regarding her ability to lead the District under the City's sole control, and Rodriguez cannot show that this was merely a pretext for retaliation. (D.E. 82 at 27; D.E. 93 at 33-37).

Under the FLSA, "it shall be unlawful for any person ... to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). In the context of an FLSA retaliation claim, courts apply the following analytical framework:

> First, a plaintiff must make a *prima facie* showing of (1) participation in protected activity under the FLSA; (2) an adverse employment action; and (3) a causal link between the activity and the adverse action. If a plaintiff meets this burden, the defendant must then articulate a legitimate, non-discriminatory reason for its decision. The burden then shifts to the plaintiff to demonstrate that the proffered reason is a pretext for discrimination.

*Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008). To engage in a protected activity, an employee must make a complaint. *Starnes v. Wallace*, 849 F.3d 627, 632 (5th Cir. 2017). For an employee's communication to qualify as a complaint, it must

36

give the employer fair notice that the employee is making a complaint that could subject the employer to a claim of retaliation.  *Id.*  The statement must be reasonably clear for the employer to understand it as an assertion of rights protected by the statute.  *Id.*  "Not all abstract grumblings or vague expressions of discontent are actionable as complaints." *Hagan*, 529 F.3d at 626 (internal quotation marks and citation omitted).  However, an "informal, internal complaint" qualifies as protected activity under the statute.  *Id.*  Even when raising an informal complaint, an employee must voice some concern regarding the illegality of a particular pay scheme and cannot merely raise a general concern about overtime pay.  *Id.*

In order for an employment action to be materially adverse, the plaintiff must show that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citation and quotation marks omitted).  The statutes do not protect against all "petty slights or minor annoyances that often take place at work and that all employees experience."  Instead, the protection is offered against employer actions that are "likely to deter victims of discrimination from complaining" of it.  *Id.*  When determining whether an action was materially adverse, courts look at factors such as whether the action affected job title, grade, hours, salary, or benefits, or caused "a diminution in prestige or change in standing among coworkers." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 827 (5th Cir. 2019).  An adverse action is not limited to workplace-related or employment-related

acts.  *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 945 (5th Cir. 2015).

"The causal link required by the third prong of the *prima facie* case does not rise to the level of a 'but for' standard," and an employee need not show that that her protected activity was the only motivating factor for the adverse action.  *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002).  Temporal proximity can be sufficient to meet the *prima facie* causation standard, but the proximity must be "very close."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (noting that a 20-month separation between the protected act and adverse action did not show causation).  "[G]aps of eight to ten months between the protected activity and the alleged adverse employment action break a causal chain.  *Welsh*, 941 F.3d at 827.  Even five months is not close enough without other evidence of retaliation.  *Feist v. Louisiana, Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013).

"A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence."  *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).  "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action."  *Id.*  In a pretext analysis, the issue "is not whether the [employer] made an erroneous decision, but whether that decision was made with a retaliatory motive."  *White v. Denton Cnty.*, 655 F. App'x 1021, 1025 (5th Cir. 2016).

Here, Rodriguez has not established a *prima facie* case of retaliation under the FLSA because the summary judgment evidence does not show that she participated in a protected activity. As an initial matter, Rodriguez's motion for summary judgment argues that she engaged in a protected activity when she complained to human resources regarding the inequitable results of the market pay study. (D.E. 81 at 21-22). However, even assuming that this could be a protected activity for one of her other discrimination-based claims, the results of the market study are wholly unrelated to her FLSA unpaid overtime claim. Even in Rodriguez's argument for summary judgment, she states that the City failed to explain "why Ms. Rodriguez received only seventy-nine percent (79%) of the market average, while her subordinate, Gonzalez, received one hundred and fourteen percent (114%) of the market average." (*Id.* at 22). This complaint plainly has nothing to do with her overtime claim, and Rodriguez's complaints about this pay disparity do not establish that she engaged in a protected activity for the purposes of her FLSA retaliation claim.

However, even considering the evidence in the record regarding Rodriguez's dissatisfaction with the City's decision to stop paying her overtime, the evidence does not establish a genuine issue regarding whether she engaged in a protected activity. The evidence in the record indicates only that Rodriguez told City officials, including Viera, that she believed she should still receive overtime based on the amount of work she was required to do during the pandemic and because Canales believed she should. (D.E. 81-3 at 8-10; D.E. 81-6 at 46; D.E. 81-17 at 3). The evidence does not show that Rodriguez ever made a complaint regarding her overtime that was reasonably clear for the City to

understand as an assertion of rights protected by the statute. *Starnes*, 849 F.3d at 632. The record instead shows that Rodriguez made the type of "abstract grumblings or vague expressions of discontent" that are not actionable as complaints. *Hagan*, 529 F.3d at 626. Most importantly, the record does not show that Rodriguez ever complained about the illegality of the City's decision to stop paying her overtime. *See id.* Even informal complaints such as those made by Rodriguez must voice a concern regarding the legality of the pay scheme. *Id.*

Accordingly, it is recommended that the City's motion for summary judgment (D.E. 82) be **GRANTED** on Rodriguez's FLSA retaliation claim. Correspondingly, it is recommended that Rodriguez's motion for summary judgment (D.E. 81) on this claim be **DENIED**.

### iii. *EPA Violation*

Rodriguez next asserts that she is entitled to summary judgment on her equal pay claim because she was paid comparatively less than Gonzalez, a younger male, despite her position requiring greater skill, effort, and responsibility. (D.E. 81 at 26). Specifically, she asserts that Gonzalez's pay was raised to 114% of the market average, while her pay was only 79% of the market average, and that there was no bona fide basis for this difference. (*Id.*). Rodriguez argues that Gonzalez is a proper comparator, as evidenced by the fact that the City began bypassing her and going directly to Gonzalez when dealing with the District. (D.E. 92 at 17; D.E. 95 at 7-8). She contends that, although her salary was higher than Gonzalez's, that does not show equal treatment where he received a much

higher percentage of the market average than her.  (D.E. 92 at 18).  Rodriguez also argues that the evidence shows that the market study itself was skewed because the comparator cities used for her and Gonzalez were not the same, leading to a higher market average for Gonzalez compared to her.  (*Id.* at 18-19; D.E. 95 at 7).

The City contends that it is entitled to summary judgment on Rodriguez's equal pay claim because she cannot establish that she performed equal work to a male employee and was paid less than that employee.  (D.E. 82 at 21-23; D.E. 93 at 17).  The City argues that Rodriguez's salary was always more than Gonzalez's.  (D.E. 93 at 17-18).  Moreover, the City argues that Gonzalez was a subordinate and Rodriguez relies on a theory based on their respective ratios of the market rate, neither of which meets the requirements of an EPA claim.  (*Id.* at 18).  The City contends that, if Rodriguez and Gonzalez did equal work, then Gonzalez would also have an EPA claim based on his lower salary.  (*Id.* at 18-19).  Finally, the City disputes the percentages that Rodriguez relies on in determining pay rates compared to the market rate.  (*Id.* at 19).

The EPA requires "equal pay for equal work regardless of sex."  *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974); *see also* 29 U.S.C. § 206(d)(1).  To establish a *prima facie* case under the EPA, a plaintiff must show that: (1) her employer is subject to the Act; (2) she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and (3) she was paid less than the employee of the opposite sex providing the basis of comparison.  *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993).  Once the plaintiff shows her *prima facie* case, the

burden shifts to the defendant to show that the pay differential falls under one of the statutory exceptions. *King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 723 (5th Cir. 2011). The plaintiff is not required to prove discriminatory intent to prevail on an EPA claim. *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994). In the Title VII context, a "variety of factors are considered when determining whether a comparator is similarly situated, including job responsibility, experience, and qualifications." *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018). The comparator's conduct need only be nearly identical, not completely identical. *Saketkoo v. Administrators of Tulane Educ. Fund*, 31 F.4th 990, 998 (5th Cir. 2022).

Here, Rodriguez has not established a *prima facie* case under the EPA because she has not presented evidence establishing either the equal-work prong or the equal-pay prong. *See Chance*, 984 F.2d at 153. Rodriguez points to Gonzalez, her Assistant Director, as a comparator. (D.E. 81 at 26). First, as to the equal-work prong, the evidence shows that Rodriguez had more responsibilities and more experience than Gonzalez. In Rodriguez's own words, she was responsible for overseeing the "day in day out operational integrity of the Health Department while navigating staff through a pandemic." (D.E. 81-17 at 3). Per the terms of the cooperative agreement, the Director was responsible for hiring the Assistant Director. (D.E. 81-1 at 10). In Rodriguez's motion for summary judgment, she states that her job required "increased skill, effort, and responsibility" compared to Gonzalez's, and that he had fewer responsibilities and less experience. (D.E. 81 at 26).

There is little evidence in the record regarding Gonzalez's job duties as Assistant Director, beyond Rodriguez's and Canales's statements that Zanoni preferred to speak with Gonzalez.  (D.E. 81-3 at 10; D.E. 81-6 at 4-5).  However, the evidence in the record indicates that Rodriguez was, as her title of Director suggests, responsible for managing the District, its budget, its staff, hiring the Assistant Director and other employees, coordinating with hospitals, and coordinating and communicating District actions with the City and County.  (D.E. 81-1 at 10; D.E. 81-3 at 13; D.E. 81-10 at 6-10; D.E. 81-17 at 3; D.E. 82-1 at 6).  Rodriguez bears the burden of showing that she and Gonzalez performed work requiring equal skill, effort, and responsibility under similar working conditions, and she has not submitted sufficient evidence to create a genuine issue on the equal-work analysis.  *Chance*, 984 F.2d at 153.

Second, even if Rodriguez could establish a genuine issue regarding the equal-work prong, she has not established that she was paid less than the employee of the opposite sex providing the basis of comparison.  Rodriguez has not cited any authority for her theory that pay relative to the market rate is the proper factor to consider, as opposed to absolute pay.  In absolute pay, it is undisputed that Rodriguez was paid a higher salary than Gonzalez throughout his tenure as her Assistant Director.  (*See, e.g.*, D.E. 82-1 at 15; D.E. 82-1 at 6; D.E. 82-3 at 6).  The deficiency in analyzing the equal-pay prong using comparative pay relative to the market rate is that, were Rodriguez to establish the equal-work prong and show that she and Gonzalez performed work requiring equal skill, effort, and responsibility, both she and Gonzalez would have simultaneous EPA claims against the

43

City, with Rodriguez's claim based on pay relative to the market rate and Gonzalez's claim based on absolute pay.

Accordingly, it is recommended that the City's motion for summary judgment (D.E. 82) be **GRANTED** on Rodriguez's EPA claim.  Correspondingly, it is recommended that Rodriguez's motion for summary judgment (D.E. 81) on this claim be **DENIED**.

> iv.   *Title VII Sex Discrimination*

Rodriguez next asserts that she is entitled to summary judgment on her Title VII sex discrimination claim because she was qualified for the Director position during the re-hiring process for the new District but was passed over for a less qualified and experienced candidate.  (D.E. 81 at 31-32).  Further, she argues that Gonzalez is a proper comparator that was treated better than her, both through preferential treatment before she was terminated and by being retained following the re-hiring process.  (*Id.* at 32; D.E. 92 at 19; D.E. 95 at 8).  Moreover, Rodriguez contends that the City cannot substantiate any allegation that it "lost confidence" in her performance.  (D.E. 95 at 9).  Finally, beyond wage discrimination, Rodriguez argues that the City unilaterally terminated her contrary to the provisions of her employment agreement, even though only four employees were not retained by the District during the re-hiring process.  (D.E. 92 at 20-21).

The City contends that it is entitled to summary judgment on Rodriguez's Title VII sex discrimination claim because she has not identified a proper comparator for her wage discrimination claim.  (D.E. 82 at 23).  The City argues that the salary survey does not support Rodriguez's claim given that some males received no raise at all or a smaller raise

than Rodriguez, including on a percentage basis compared with the market rate. (*Id.* at 23-24). To the extent Rodriguez's Title VII claim is based on something other than wage discrimination, the City argues that Rodriguez cannot show an adverse employment action or a proper comparator. (*Id.* at 24-25). As to the failure to re-hire Rodriguez as Director, the City argues that her replacement was also a female. (D.E. 93 at 20). As to Gonzalez as a comparator, the City argues that he did not hold the same position as Rodriguez, did not work in nearly identical circumstances, and did not have complaints against him by other employees. (*Id.* at 21-23; D.E. 99 at 15-16). Finally, the City contends that, to the extent Rodriguez is raising a sexual harassment claim, there is no evidentiary support for such a claim. (D.E. 82 at 25).

Under Title VII, it is unlawful to discriminate against an employee on the basis of sex. 42 U.S.C. § 2000e–2(a). In a disparate treatment case, an employee must establish that her employer had a discriminatory intent or motive for taking a job-related action. *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

To establish a *prima facie* case of sex discrimination based on disparate treatment, an employee generally must demonstrate that "(1) she is a member of a protected class; (2) she was qualified for the position she sought; (3) she suffered an adverse employment action; and (4) others similarly situated but outside the protected class were treated more favorably." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007). If based on a termination, the plaintiff must show at the fourth step that she was replaced by someone outside the protected class. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir.

2002).  If the plaintiff establishes her *prima facie* case, the burden shifts to the defendant

to articulate a legitimate, non-discriminatory rationale for its actions.  *Welsh*, 941 F.3d at

824-25.

To establish a wage discrimination claim under Title VII, "a plaintiff must show

that [s]he was a member of a protected class and that [s]he was paid less than a non-member

for work requiring substantially the same responsibility."  *Taylor v. United Parcel Serv.,*

*Inc.*, 554 F.3d 510, 522 (5th Cir.2008).  The "similarly situated" analysis requires a

comparator employee outside of the protected class who was treated better.  *Saketkoo*, 31

F.4th at 998.  As noted above, this analysis requires consideration of various factors,

including job responsibility, experience, and qualifications, and the comparator's conduct

need only be nearly identical.  *Id.*

Adverse employment actions include "only ultimate employment decisions such as

hiring, granting leave, discharging, promoting, or compensating."  *McCoy v. City of*

*Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (internal citation omitted).  "[A]n

employment action that 'does not affect job duties, compensation, or benefits' is not an

adverse employment action."  *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir.

2004).  A loss of job responsibilities alone does not qualify as an adverse employment

action, but in certain cases, a change or loss in job responsibilities may be "so significant

and material that it rises to the level of an adverse employment action."  *Thompson v. City*

*of Waco, Tx.*, 764 F.3d 500, 504 (5th Cir. 2014) (collecting cases).  "[C]riticism, such as [a

supervisor's] oral threats or abusive remarks, does not rise to the level of an adverse

employment action." *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000). Similarly, a negative performance evaluation is not an adverse employment action. *Johnson v. McDonald*, 623 F. App'x 701, 704 (5th Cir. 2015). Fifth Circuit precedent is split regarding whether a reprimand can be an adverse employment action. *Welsh*, 941 F.3d at 824.

When a plaintiff proffers another employee as a comparator, the employment actions at issue must be taken under nearly identical circumstances. *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). The circumstances are nearly identical when "the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Id.*

To raise a sexual harassment claim, a plaintiff must show that: (1) she belongs to a protected class; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a 'term, condition, or privilege' of employment. *Lauderdale v. Texas Department of Criminal Justice, Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007). To affect a term, condition, or privilege of employment, "sexual harassment must be sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). This requires looking at the totality of the circumstances. *Lauderdale*, 512 F.3d at 163. Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating,

or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harvill v. Westward Communications, LLC*, 433 F.3d 428, 434 (5th Cir. 2005). The conduct must also be objectively and subjectively offensive. *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999).

Here, Rodriguez has not established a *prima facie* case of sex discrimination based on wage discrimination, discriminatory termination, or otherwise. As to a Title VII wage discrimination claim, similar to her EPA claim, Rodriguez has not identified a proper comparator from outside of her protected class who was paid more for work requiring substantially the same responsibility. *Taylor*, 554 F.3d at 522. For the same reasons discussed above in the EPA analysis, the evidence does not show that Gonzalez had substantially the same job responsibilities as Rodriguez or that he was paid more. Further, the evidence shows that Gonzalez stopped receiving overtime pay at the same time as Rodriguez. (D.E. 93-5 at 9). And while other District employees continued to receive overtime payments, there is no evidence in the record regarding who continued to receive overtime, what their job title and duties were, how much they received, or anything else necessary to establish that any of these employees was a proper comparator from outside Rodriguez's protected class who was treated better. (*See id.*). To the extent that Rodriguez relies on the market pay survey, the results of the study also do not support a sex discrimination claim. In absolute terms, the highest raise as a result of the survey went to a woman, Laura Garcia, who is not someone outside of Rodriguez's protected class. (D.E. 82-1 at 15). In terms of pay relative to the market rate, the employees with the highest

48

salary relative to the market rate were Michael Dice and Nina Nixon-Mendez, one of whom is not outside of Rodriguez's protected class. (*Id.*).

To the extent that Rodriguez bases her Title VII claim on her termination, she has not created a genuine issue of material fact regarding whether the City discriminated against her on the basis of sex because, regardless of qualifications or experience, she was replaced by another woman. (D.E. 81-4 at 13; D.E. 81-24 at 12; D.E. 93-1 at 4); *Sandstad*, 309 F.3d at 897. This necessarily fails on the fourth prong of the *prima facie* test, which requires that Rodriguez identify someone outside her protected class. *Alvarado*, 492 F.3d at 611.

To the extent that Rodriguez bases her Title VII claim on something outside of wage discrimination or her termination, she has not shown that she suffered any other adverse employment action. Unlike for retaliation claims, the standard for showing an adverse employment action on a substantive discrimination claim requires showing an "ultimate employment decision[] such as hiring, granting leave, discharging, promoting, or compensating." *McCoy*, 492 F.3d at 559; *Welsh*, 941 F.3d at 826 (noting that the standard is broader for retaliation claims than substantive claims). Of the various adverse actions Rodriguez references throughout her complaint and filings, none meet this standard, including undervaluing her performance in an annual review, withholding information from the human resources investigation, and authoring a false disciplinary memorandum. *See Pegram*, 361 F.3d at 282 (stating that actions that do not affect job duties, compensation, or benefits do not qualify); *Breaux*, 205 F.3d at 158 (stating that criticism

and oral threats do not qualify); *Johnson*, 623 F. App'x at 704 (stating that a negative performance evaluation does not qualify); *but see Welsh*, 941 F.3d at 824 (noting that Fifth Circuit precedent is split regarding whether a reprimand qualifies).

To the extent that Rodriguez is raising a sexual harassment claim, the only evidence in the record supporting such a claim is her own testimony regarding the sexually inappropriate comment and picture during a presentation at the executive retreat and Steward's resignation letter.  (D.E. 81-3 at 8-9; D.E. 92-12 at 2).  As to Steward's letter, it is unsworn and is not competent summary judgment evidence.  *See Parker v. Bd. of Sup'rs Univ. of Louisiana-Lafayette*, 296 F. App'x 414, 418 (5th Cir. 2008).   As to the inappropriate content at the executive retreat, that alone does not establish that the sexual harassment was "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment."  *Morgan*, 536 U.S. at 116.  Considering the relevant factors, it was a one-time event, it was an offensive utterance rather than something physically threatening or humiliating, and there is no indication that it interfered with Rodriguez's work performance.  *Harvill*, 433 F.3d at 434.

Accordingly, it is recommended that the City's motion for summary judgment (D.E. 82) be **GRANTED** on Rodriguez's Title VII sex discrimination claim.  Correspondingly, it is recommended that Rodriguez's motion for summary judgment (D.E. 81) on this claim be **DENIED**.

*v.    EPA and Title VII Retaliation*

Rodriguez next asserts that she is entitled to summary judgment on her EPA retaliation claim because, as in her FLSA retaliation claim, she made a demand for the wages she was entitled to, and the City retaliated against her by taking several adverse action including undervaluing her performance in her annual review, withholding information from an investigation, authoring a false disciplinary memorandum, denying her overtime pay, and terminating her.  (D.E. 81 at 26-27).  As to her Title VII retaliation claim, Rodriguez asserts that she engaged in a protected activity when she complained of the pay discrepancies between men and woman and, as in her other retaliation claims, the City responded by taking several adverse actions against her, culminating in her termination.  (*Id.* at 33).  She argues that the evidence shows a causal connection between her protected activity and the adverse actions because the City was aware of her complaints and the adverse actions happened in a short period of time.  (*Id.*).

The City's motion and other briefing addresses all retaliation claims in the same section, and thus generally argue that Rodriguez has not shown any adverse action, causation, or pretext.  (D.E. 82 at 26-26; D.E. 93 at 23-37; D.E. 99 at 16-17).  As to the EPA and Title VII retaliation claims specifically, the City argues that, like the FLSA claim, the evidence shows only that Rodriguez complained about the City not factoring longevity into the salary determinations, not gender discrimination, and therefore did not participate in protected conduct.  (D.E. 93 at 25).

The general legal standard for proving unlawful retaliation under the EPA and Title VII is the same as under the FLSA.  *See Lindsley*, 984 F.3d at 469.  "An employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996) (citing 42 U.S.C. § 2000e–3(a)). In order for a complaint to qualify as protected activity, it must reference what basis the alleged discrimination is on, and complaining about unfair treatment generally is not protected activity.  *Davis v. Dallas Indep. Sch. Dist.*, 448 F. App'x 485, 493 (5th Cir. 2011).

Under Texas law, a public health district may be established by, among other combinations, a county and one or more municipalities in the county.  Tex. Health & Safety Code § 121.041.  The members of a district must prepare a cooperative agreement that sets out the terms of operation of the district.  *Id.* § 121.044(a).  Among other things, the cooperative agreement must include: (1) the organizational structure; (2) the procedures for modification of the agreement, withdrawal of members, dissolution of the district, and selection and removal of a director.  *Id.* § 121.044(b).  The cooperative agreement must be approved by the governing body of each member.  *Id.* § 121.044(c).  Any modification of the agreement must be in writing and is effective on approval by the governing body of each member.  *Id.* § 121.044(d).  The members of the district appoint the director.  *Id.* § 121.045(a).

Here, the summary judgment evidence does not show that Rodriguez engaged in any protected activity prior to counsel's October 2021 letter to Zanoni.  Counsel's letter and Rodriguez's subsequent complaints to the EEOC and Texas Workforce Commission state explicit claims of discrimination and clearly qualify as protected activities.  (D.E. 92-16 at 3-9); *Long*, 88 F.3d at 304; *Davis*, 448 F. App'x at 493.  However, before the letter, the evidence shows that, although Rodriguez raised complaints about the results of the market pay survey, her complaints were based on the survey's failure to take tenure and experience into account.  (D.E. 81-3 at 3-6; D.E. 81-17 at 3; D.E. 82-1 at 116; D.E. 82-3 at 6-7).  Throughout the evidence, this is consistently how her complaints are portrayed both by City officials and, more importantly, Rodriguez herself.  (*See id.*).  Although Rodriguez did compare herself to Gonzalez and indicated to Viera that she felt she was being treated differently than him, the evidence does not indicate that Rodriguez ever connected this to a discriminatory motive or their respective sexes.  (*See id.*).  Instead, again, the evidence shows that Rodriguez's complaints were based on her relative experience compared to Gonzalez and general unfair treatment, which do not qualify as protected activity for the purposes of a retaliation claim under the EPA or Title VII.  (*See id.*); *Davis*, 448 F. App'x at 493.  Accordingly, Rodriguez has established the first prong for a *prima facie* case of retaliation under the EPA and Title VII, but only as of October 7, 2021.

Because the evidence does not show that Rodriguez engaged in a protected activity under Title VII or the EPA before October 7, 2021, any alleged adverse employment actions prior to that date cannot form the basis of an actionable retaliation claim.  However,

following counsel's letter and Rodriguez's subsequent charges of discrimination with the EEOC and Texas Workforce Commission, the City took the undisputed adverse employment action of terminating Rodriguez's employment on March 1, 2022.  (D.E. 81-20 at 2).  Accordingly, Rodriguez has established the second prong for a *prima facie* case of retaliation under the EPA and Title VII.

As to causation, the nearly five months between counsel's letter and Rodriguez's termination would typically sever the presumption of causation.  *Feist*, 730 F.3d at 454.  However, the City terminated Rodriguez on March 1, 2022, the very first day it had sole control over the decision.  (*See* D.E. 82-1 at 98, 103-04).  Indeed, the City did not even wait for Rodriguez to return from sick leave, but rather terminated her immediately over text message.  (D.E. 81-20 at 2).  Given this timing and the system of split control prior to March 1, 2022, that prevented the City from unilaterally terminating Rodriguez earlier, the evidence establishes a genuine issue of material fact regarding causation, and Rodriguez has met the burden of showing a *prima facie* case of retaliation under the EPA and Title VII.

However, the City has proffered a legitimate, non-discriminatory reason for Rodriguez's termination, and Rodriguez has not submitted evidence establishing that this reason was merely pretextual.  *Hagan*, 529 F.3d at 624.  Viera stated that Rodriguez was not retained due to employee complaints regarding her managerial style and employee morale, which were consistent with employee complaints made to human resources and comments made by Gonzalez.  (D.E. 82-1 at 9-11).  The documentary evidence shows that,

in January 2015, a City audit of the District uncovered employee discontent, with a majority of supervisors and managers believing the District to be dysfunctional.  (*Id.* at 55).  Employees voiced concerns about problems in the administration's "basic approaches to employee relations such as treating people with respect, consistent enforcement of policies [between the District, City, and County), and dispute resolution."  (*Id.*).  This audit occurred during Rodriguez's time as Director, although the City Manager and County Judge at the time continued to support her.  (*Id.* at 56).

In January 2020, before Rodriguez's protected activity and before the start of the COVID-19 pandemic, Viera submitted a memorandum to Zanoni recommending that the District replace Rodriguez for several reasons, including employee complaints that she was not keeping normal work hours and difficult to reach by phone.  (D.E. 82-1 at 116).  In July and August 2021, still before Rodriguez's protected activity, the City's Human Resources Department investigated employee complaints that Rodriguez created a hostile work environment by being unprofessional and intimidating, with a history of retaliatory conduct and threats.  (D.E. 81-13 at 3-4).  The Human Resources investigation noted the similar employee complaints in 2014 that led to the City's audit of the District.  (*Id.* at 5).  Although the investigation concluded that "the allegations could not be confirmed," the investigation did not totally clear Rodriguez, as she now argues.  (*Id.*).  The investigator concluded that she believed the employees believed they worked in a hostile work environment and feared for their jobs, which negatively impacted the work environment.  (*Id.*).  Finally, Viera and Zanoni noted these problems in Rodriguez's 2021 performance evaluation, stating that

Rodriguez's availability was an issue according to employee complaints and IT analysis and that she failed to engage with staff in a professional manner. (D.E. 81-12 at 4).

To rebut the City's legitimate, non-discriminatory reason for her termination and create a genuine fact issue regarding whether it was merely a pretext for retaliation, Rodriguez must submit evidence of disparate treatment or evidence showing that the City's reason is false or unworthy of credence. *Laxton*, 333 F.3d at 578. She has not done so. First, as to disparate treatment, Rodriguez has not identified a proper comparator as she has not identified any other District or City employee with the type of complaints made against her that was treated differently. Throughout her motion, Rodriguez's primary comparator is Gonzalez, but there is no evidence in the record that Gonzalez had any employee complaints about his managerial style or availability. As to evidence tending to show that the City's reason is false or unworthy of credence, Rodriguez has not submitted any evidence refuting the City's evidence of employee dissatisfaction. In her affidavit, Canales stated that she believes the City's actions against Rodriguez were retaliatory as a result of her complaints about the market pay study and overtime. (D.E. 81-6 at 5-6). She also noted that she disagreed with the City's performance evaluation. (*Id.* at 6). However, beyond Canales's bare statement that the City's actions and statements were retaliatory or wrong, there is nothing in her affidavit that refutes the employee complaints presented by the City as the reason for Rodriguez's termination, which extend back to 2015. (*See generally* D.E. 81-6 at 3-7).

56

The issue in a pretext analysis is not whether the City's decision to terminate Rodriguez was factually correct, or even fair, but rather whether it was retaliatory.  *White*, 655 F. App'x at 1015.  Rodriguez has not met her burden to submit evidence rebutting the City's non-discriminatory reason for her termination.  Accordingly, it is recommended that the City's motion for summary judgment (D.E. 82) be **GRANTED** on Rodriguez's EPA and Title VII retaliation claims.  Correspondingly, it is recommended that Rodriguez's motion for summary judgment (D.E. 81) on this claim be **DENIED**.

### vi.   *ADA and ADEA Retaliation*

Rodriguez next asserts that she is entitled to summary judgment on her ADA retaliation claim because Zanoni was aware that she was deaf and had requested an accommodation, but refused to make an accommodation and then took several adverse employment actions against her.  (D.E. 81 at 34).  Similarly, Rodriguez contends that she is entitled to summary judgment on her ADEA retaliation claim because she refused to participate in the City's discriminatory age-based practices, including the routine favoring of Gonzalez over her.  (*Id.* at 35-36).

The City's motion and other briefing addresses all retaliation claims in the same section, and thus generally argue that Rodriguez has not shown any adverse action, causation, or pretext.  (D.E. 82 at 26-26; D.E. 93 at 23-37; D.E. 99 at 16-17).  As to the ADEA retaliation claim specifically, the City argues, like the FLSA, EPA, and Title VII retaliation claims, the evidence shows only that Rodriguez complained about the City not factoring longevity into the salary determinations, not age discrimination, and therefore did

not participate in protected conduct.  (D.E. 93 at 25-26).  As to the ADA retaliation claim, the City argues that the evidence does not show that she made a request for an accommodation sufficient to qualify as protected activity.  (*Id.* at 26-27).

The legal standard for proving unlawful retaliation under the ADA and ADEA is the same as under the FLSA.  *See Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998).  Under the ADA, in order to show that they engaged in a protected activity, a plaintiff must show that she made an adequate request for an accommodation.  *Pittman v. Am. Airlines, Inc.*, 692 F. App'x 549, 552 (10th Cir. 2017).  The request must make clear that the plaintiff wants assistance for her disability.  *Id.*

As to Rodriguez's ADA retaliation claim, it is debatable whether she has established either a protected activity or causation between that protected activity and her disability. Rodriguez has presented evidence that she told Zanoni of her hearing disability and requested an accommodation of having questions repeated when she could not hear them, which he refused to do.  (D.E. 81-3 at 15).  However, even if Rodriguez has established a *prima facie* case of retaliation, this claim fails for the same reason as her EPA and Title VII retaliation claims: the City has proffered a legitimate, non-discriminatory reason for her termination, and Rodriguez has not established that this reason is merely pretext.

Finally, as to retaliation under the ADEA, Rodriguez has again not established that the City's legitimate, non-discriminatory reason for terminating her was merely pretext.  In her complaint, Rodriguez alleges that she opposed the firing of another employee, allegedly ordered by Zanoni as a result of the employee's age.  (D.E. 47 at 4-5).  However, there is

no evidence in the record regarding this incident.  Otherwise, as in her other claims, Rodriguez relies on a comparison to Gonzalez, who was younger than her.  However, as in her EPA and Title VII retaliation claims, the summary judgment evidence does not show that Rodriguez engaged in any protected activity prior to counsel's October 2021 letter to Zanoni.  As above, the evidence shows that, although Rodriguez raised complaints about the results of the market pay survey, her complaints were based on the survey's failure to take tenure and experience into account.  (D.E. 81-3 at 3-6; D.E. 81-17 at 3; D.E. 82-1 at 116; D.E. 82-3 at 6-7).   The remainder of the analysis also mirrors the analysis of Rodriguez's EPA and Title VII retaliation claims: she has established that she engaged in a protected activity as of October 7, 2021, that she suffered an adverse employment action when she was terminated, and that causation exists between her protected activity and her termination.  *Hagan*, 529 F.3d at 624.  However, the City proffered a legitimate, non-discriminatory reason for her termination, and Rodriguez has not established that this reason is merely pretext.

Accordingly, it is recommended that the City's motion for summary judgment (D.E. 82) be **GRANTED** on Rodriguez's ADA and ADEA retaliation claims.  Correspondingly, it is recommended that Rodriguez's motion for summary judgment (D.E. 81) on this claim be **DENIED**.

59

## V.   *MOTIONS TO STRIKE (D.E.s 88, 101, 102)*

### a.   **Motion to Strike Standard**

A party must provide to the other parties "the name and, if known, the address and telephone numbers of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). A party who has made a disclosure under Rule 26(a) must "supplement or correct its disclosure … in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The purpose of Rule 37(c)(1) is to prevent an ambush, resulting in surprise or prejudice, of undisclosed or late disclosed evidence." *Jonibach Mgmt. Tr. v. Wartburg Enterprises, Inc.*, 136 F. Supp. 3d 792, 808 (S.D. Tex. 2015).

The sham affidavit doctrine prevents a party who has been deposed from introducing an affidavit that contradicts that person's deposition testimony without explanation because "a nonmoving party may not manufacture a dispute of fact merely to

defeat a motion for summary judgment." *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220

F.3d 380, 386 (5th Cir. 2000).  However, not every discrepancy results in the exclusion of

the affidavit, and slightly inconsistent affidavits can explain certain aspects of a party's

deposition testimony.  *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980).

A high bar applies to the sham affidavit doctrine, "typically requiring affidavit testimony

that is inherently inconsistent with prior testimony."  *Seigler v. Wal-Mart Stores Texas,*

*L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022) (internal quotation marks omitted).  Where a party

changes their testimony, they must provide some explanation.  *Free v. Wal-Mart*

*Louisiana, L.L.C.*, 815 F. App'x 765, 766 (5th Cir. 2020).  "When an affidavit merely

supplements rather than contradicts prior deposition testimony, the court may consider the

affidavit when evaluating genuine issues in a motion for summary judgment."  *S.W.S.*

*Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996).  An affidavit properly

supplements deposition testimony when it clarifies facts by giving greater detail or

additional facts not provided in the deposition.  *Id.*

### b.    Motion to Strike Viera's Declaration (D.E. 88)

#### i.    Arguments

Rodriguez argues that the City submitted Viera's declaration in support of its motion

for summary judgment in an attempt to contradict damaging testimony that Viera gave

during his depositions, making it a sham affidavit.  (D.E. 88 at 3-5, 7).  In particular,

Rodriguez takes issue with Viera's different characterizations of the decision-making

process regarding her employment at the District, and she contends that his declaration

inappropriately, and incorrectly, represents that the City could make unilateral employment decisions without the concurrence of the County Judge.  (*Id.* at 7-9).  Rodriguez also contends that Viera's declaration is inconsistent to the extent that he now states that political and ideological differences were an issue in her termination and that the City received many complaints about her.  (*Id.* at 5-6).  Finally, Rodriguez also asserts that the materials that Rodriguez relied on in his declaration were skewed because the City never put a litigation hold in place, meaning "many documents have been lost, or … simply never produced."  (*Id.* at 2-3).

The City responds that, first, Rodriguez merely speculates that there are documents that have not been produced and has not suggested what those documents might show.  (D.E. 98 at 2-3).  The City argues that the lack of a litigation hold is not evidence that any materials were destroyed because the City is legally required by state law to preserve documents.  (*Id.* at 3).  Further, the City argues that Viera's declaration is not inconsistent with his deposition testimony, and that the decision-making process regarding her employment was governed solely by the relevant statutes and the Cooperative Agreement between the City and the County.  (*Id.* at 4-7).  As to Rodriguez's contention that her termination was politically motivated, the City argues that Viera's deposition and declaration were consistent that Viera did not know political party affiliations for any of the City or County leadership.  (*Id.* at 7-8).  Finally, the City argues that Viera was consistent regarding workplace complaints received about Rodriguez.  (*Id.* at 8-10).

Rodriguez first replies that she is not merely speculating that documents were not produced, as shown by the fact that no communications from the Mayor were produced. (*Id.* at 1-3). She reiterates that there are several significant inconsistencies between Viera's declaration and his prior deposition testimony. (*Id.* at 3-5).

### ii.   *Additional Relevant Evidence*

In a November 2021, e-mail, Rodriguez's counsel advised the City Attorney of a litigation hold including, among other things, any correspondence between Zanoni, the mayor, and any other City officials and employees. (D.E. 88-5 at 2). In a November 29, 2022, order, the District Court ordered the City to "produce any e-mail or other written correspondence that Defendant sent its employees informing them of any litigation hold due to Plaintiff's claims." (D.E. 78 at 1). The City's responses to this order indicated that no such items were found. (D.E. 88-1 at 2; D.E. 88-2 at 3).

### iii.   *Analysis*

As an initial matter, as to Rodriguez's arguments regarding the City's failure to issue a litigation hold and the potential for lost or unproduced documents, this is a serious allegation. Indeed, Rodriguez contends that it is indicative of "willful misconduct" that could justify serious sanctions. (D.E. 88 at 3 n.3). However, Rodriguez has not filed a motion for sanctions. Despite the seriousness of her allegations, she has not even addressed this claim in her motion outside of three sentences and a footnote in the "Introduction" section. (*Id.* at 3 and n.3). Rodriguez cites a single district court case and merely speculates that there must be additional materials, such as e-mails, from Mayor Paulette Guajardo that

she has not received.  (*Id.* at 3 n.3).  The "Arguments and Authorities" section of her motion does not address this issue at all, instead arguing only that Viera's declaration should be stricken because, under the sham affidavit doctrine, his statements in the declaration are inconsistent with his deposition testimony.  (*Id.* at 7-9).  In short, absent a request for sanctions or further discovery remedies, based on more than mere speculation and with full briefing beyond a single footnote, consideration of this issue is premature.

Viera's declaration is supplementary to his deposition testimony, not contradictory or entirely new.  First, Viera's deposition and declaration consistently state that, prior to March 1, 2022, the City Manager and County Judge had to agree on changes to the conditions of employment for the Director and Assistant Director of the District.  (D.E. 81-4 at 2-3; D.E. 82-1 at 2, 7).  Rodriguez appears to take issue with Viera's references to "dual" or "shared" control of the District but does not explain how this is inconsistent with Viera's previous deposition testimony regarding the requirement of County Judge consent before the City assumed sole control of the District.  (D.E. 88 at 3-4).  These are wholly consistent statements.  Second, Rodriguez complains that Viera's declaration is "silent" as to some facts discussed during his deposition.  Rodriguez has not cited any authority that Viera was required to re-address everything from his deposition, and silence on a particular issue is not inconsistent.  Third, Rodriguez has not identified any inconsistency in Viera's statements regarding ideological or political tension.  As Rodriguez's own wording in her motion identifies, Viera testified that he was not aware of any *partisan* tension, whereas in his declaration, he notes that Rodriguez and Canales were on a different side of the mask

mandate issue than city officials.  (D.E. 88 at 5-6).  Rodriguez's declaration does not state that this disagreement was based on partisan differences and is not inconsistent.  (D.E. 82-1 at 6).

Finally, Rodriguez's declaration and deposition are not inconsistent in their evaluation of Rodriguez's work performance and leadership.  Contrary to Rodriguez's argument, Viera did not testify that City officials agreed that Rodriguez's work performance exceeded expectations.  He testified that her final evaluation gave a score of "exceeds expectations" as a result of averaging the City's overall score of 3 with the Canales's overall score of 4, which rounded to a 4.  (D.E. 81-4 at 11-12).  Viera did testify that he was not aware of a formal human resources investigation into employee complaints about Rodriguez.  (D.E. 81-4 at 9, 18-19).  However, his statements in his declaration do not contradict this testimony.  In his declaration, Viera stated that he became aware of employee complaints during the transition process to City control, that he had heard similar complaints previously from Gonzalez, and that he knew human resources had received similar complaints.  (D.E. 82-1 at 9-10).  Consistent with his deposition testimony, Rodriguez stated that he was not aware at the time of his deposition that human resources had conducted a formal investigation.  (*Id.*).  Further, contrary to Rodriguez's contention, this human resource investigation did not fully clear Rodriguez of the employee complaints.  Although the investigation concluded that "the allegations could not be confirmed," the investigator nonetheless concluded that she believed the employees

believed they worked in a hostile work environment and feared for their jobs, which negatively impacted the work environment.  (D.E. 81-13 at 5).

Viera's declaration is supplementary to his deposition testimony, not contradictory or entirely new.  Accordingly, it is recommended that Rodriguez's motion to strike (D.E. 88) be **DENIED**.

### c.      Motion to Strike Cruz's Declaration (D.E. 101)

#### i.      Arguments

Rodriguez contends that the City failed to properly disclose Marie Odette Cruz as an individual likely to have discoverable information.  (D.E. 101 at 1-5).  Accordingly, Rodriguez argues that her declaration and attached exhibits, submitted by the City in it reply in support of its motion for summary judgment, should be stricken.  (*Id.* at 3-5).

The City responds that it complied with its disclosure obligations because, given the extensive number of documents, it could not have named every possible person who might have relevant information, particularly before knowing what Rodriguez was going to argue. (D.E. 108 at 5-7).  The City argues that it produced all of the market rate study data, which included Cruz's e-mails during the study, and Rodriguez could have known from her analysis of that evidence that Cruz was involved in the study.  (*Id.*).  Further, the City argues that it is entitled to present Cruz as a rebuttal witness in response to Rodriguez's argument that the results of the market rate study were manipulated, and that Rodriguez cannot show prejudice).  (*Id.* at 8-12).

66

### ii.   Additional Relevant Evidence

Cruz stated the following in a March 31, 2023, declaration.  (D.E. 99-2 at 2-3).

Beginning in March 2020, she was the Compensation Manager for the City.  (*Id.* at 2).

Before that, she was a Senior Human Resources Analyst for the City, and in this role, she

communicated with the human resources staff in other Texas cities to obtain information

for the salary survey.  The cities included were Amarillo, Arlington, Austin, Brownsville,

Dallas, El Paso, Fort Worth, Frisco, Garland, Grand Prairie, Houston, Irving, Laredo,

Lubbock, Plano, and San Antonio.  (*Id.*).  Not every city had a position that matched each

of the executive positions in the City, including several that did not have positions matching

the Director and/or Assistant Director of Health.  (*Id.* at 2-3).

In May 2019, the City's human resources staff contacted other Texas cities to obtain

information for a salary survey for executive staff.  (*See, e.g., id.* at 4-5).  Several cities

surveyed, including Frisco, Grand Prairie, and Irving, did not have positions matching

Director or Assistant Director of Public Health.  (*Id.* at 13-29, 37-39).  Others, like Garland

and Plano, did not have a position matching Assistant Director of Public Health.  (*Id.* at 34,

42).

### iii.   Analysis

It is recommended that Rodriguez's motion (D.E. 101) be **DENIED AS MOOT**.

The above analysis on the motions for summary judgment does not rely on Cruz's

declaration or the attachments, and it is unnecessary to rule on the merits of the motion to

strike.

### d.       Motion to Strike Zanoni's Declaration (D.E. 102)

#### i.       Arguments

Rodriguez argues that Zanoni's declaration is a sham that contradicts the other evidence in the record.  (D.E. 102 at 1-10).  Specifically, Rodriguez argues that Zanoni's statements contradict other record evidence regarding: (1) third-party involvement in the market rate study; (2) whether any employee received a raise to above 100% of the market rate; (3) whether the 85 to 90 percent of market rate goal was on a group or individual basis; (4) whether employee complaints during the transition process could have "confirmed" existing doubts about Rodriguez's leadership; and (5) when Zanoni could have become aware of Rodriguez's disability.  (Id.).

The City first responds that Rodriguez's argument about third-party involvement in the market rate study is irrelevant because she cannot show a *prima facie* case of sex discrimination for other reasons.  (D.E. 109 at 2-4).  The City otherwise argues that it made the necessary disclosures and Zanoni's declaration was not inconsistent with the rest of the record.  (Id. at 3-18).

#### ii.      Additional Relevant Evidence

Zanoni stated the following in a March 23, 2023, declaration.  (D.E. 93-2).  He became City Manager in 2019.  (Id. at 2).  One of his first initiatives was to raise executive pay closer to market rates.  To do this, he asked staff to survey other Texas cities to see what their minimum and actual salaries were for corresponding positions.  Not every other city had equivalent positions, so not every position relied on the same number of data points

when calculating salaries.  The City submitted their survey to Workforce Solutions of the Coastal Bend, which considered the City's data, added additional data from outside the state, and concurred with the City's analysis.  (*Id.*).  Zanoni and the human resources staff considered the salary data and other factors, including the available funds, relative size of comparator cities, whether the employee received a car allowance, and whether the employee was newly hired in determining what raises to give.  (*Id.* at 2-3).  Gender was not a consideration, and the largest increase by percentage and amount went to a woman.  (*Id.* at 3).  The City did not provide any raises that went above 100% of the market rate, and the goal was to bring the average salary of the executive group to 85% of the market rate, and eventually 90%.  (*Id.*).

Zanoni further stated that he communicated with Gonzalez when Rodriguez was not available or Gonzalez had first-hand knowledge about an issue, but he also communicated with Rodriguez when only she could address an issue or when they both attended the same meeting or press conference.  (*Id.* at 3-4).  The positions of Director and Assistant Director were not equivalent, and, among other differences, the Director had supervisory authority over the Assistant Director.  (*Id.* at 4).  He was not aware of any complaints about Gonzalez's managerial style, but he was aware of complaints about Rodriguez's management style, including from Gonzalez and other District employees.  (*Id.* at 4-5).  He was not aware that Rodriguez had a hearing impairment until she began her legal proceedings.  (*Id.* at 5).  He did not berate Rodriguez when she questioned him about her pay adjustment in 2019.  (*Id.* at 6).  The alleged slide at the executive retreat containing a

naked woman did not exist, and Zanoni was not aware of any complaints by other City employees about any such slide.  (*Id.*).

      *iii.*  *Analysis*

It is recommended that Rodriguez's motion be denied as moot.  The above analysis on the motions for summary judgment does not rely on Zanoni's declaration and it is unnecessary to rule on the merits of the motion to strike.

Regardless, however, Zanoni's declaration supplements the other evidence in the record and is not contradictory or entirely new.  First, Zanoni's declaration is not the first time the City revealed that it worked with Workforce Solutions of the Coastal Bend in developing the market pay survey.  Zanoni stated as much in his November 2019 letter to Rodriguez informing her about the first market rate raise.  (D.E. 82-1 at 16).[4]  Second, as to Zanoni's statement that the City did not provide raises that pushed any employee's salary above 100% of the market rate, Rodriguez has cited a 125-page document with no indication what parts contradict Zanoni's statement.  (*See* D.E. 102 at 8; D.E. 102-6).  Zanoni's statement is consistent with evidence previously submitted by the City, which shows that, while some employees received above 100% of the market rate, that was true before the market rate study, and they did not receive raises.  (D.E. 82-1 at 15).  Third, contrary to Rodriguez's argument, all the City's communications regarding the market rate study in the record indicated that the goal was to raise the *average* pay of the executive

---

[4] Notably, although submitted by the City alongside its motion for summary judgment, the page stamp at the bottom of this exhibit indicates that it was provided by Rodriguez.

*group* to the 85 to 90 percent threshold.  (D.E. 82-1 at 16-17; D.E. 81-4 at 3-4).  Viera's deposition testimony also does not contradict Zanoni's statement as he testified that the goal was to ensure executive pay was competitive within the market and "close to" the 90% mark.  (D.E. 81-4 at 3-4).

Fourth, as to Zanoni's statement that employee complaints during the transition process "confirmed existing concerns about Rodriguez's" unprofessional behavior, Rodriguez's argument focuses on the human resources investigation.  (D.E. 102 at 9).  However, Zanoni's declaration does not reference that investigation, and it does not contradict the record generally, which contains other evidence City officials' concerns about Rodriguez's leadership.  (D.E. 81-13 at 3-5; D.E. 82-1 at 52-56, 115-16).   Finally, as to Zanoni's statement that he did not became "aware that Rodriguez had a hearing impairment until after she began legal proceedings against the City," Rodriguez assumes this must refer to her EEOC complaint, which was preceded by counsel's letter to Zanoni in October 2021.  (D.E. 102 at 9).  However, while counsel's letter may not have technically been the beginning of the legal proceedings, receiving a letter from a lawyer threatening a lawsuit could be seen by a layperson as the beginning of legal proceedings, and this statement is not inherently inconsistent with the record evidence.  (D.E. 92-16 at 3-5); *Seigler*, 30 F.4th at 477.

Accordingly, it is recommended that Rodriguez's motion to strike (D.E. 102) be **DENIED AS MOOT** or, alternatively, **DENIED**.

## VI.   MOTIONS TO EXCLUDE (D.E.s 83, 84)

The City has moved to exclude the expert testimony of Luis Wilmot (D.E. 83) and Patty Jahn (D.E. 84), both of whom were designated to testify regarding Rodriguez's damages.  However, the above recommendation to grant the City's motion for summary judgment as to all claims and dismiss the case renders these motions moot.  Accordingly, it is recommended that the City's motions to exclude Wilmot (D.E. 83) and Jahn (D.E. 84) be **DENIED AS MOOT**.

## VII. RECOMMENDATION

Accordingly, it is recommended that: (1) Rodriguez's motion for summary judgment (D.E. 81) be **DENIED**; (2) the City's motion for summary judgment (D.E. 82) be **GRANTED**; (3) Rodriguez's motion to strike the declaration of Steven Viera (D.E. 88) be **DENIED**; (4) Rodriguez's motions to strike the declarations of Peter Zanoni and Marie Odette Cruz (D.E. 101, 102) be **DENIED AS MOOT**; and (5) the City's motions to exclude the expert testimony of Luis Wilmot and Patty Jahn (D.E. 83, 84) be **DENIED AS MOOT**.

Respectfully submitted on August 7, 2023.

Julie K. Hampton
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).